**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL FUCHS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 7137** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Michael Fuchs, seeks judicial review of the final decision of the Commissioner of Social Security (Commissioner), made on August 19, 2011, which found plaintiff was not disabled and thus was not entitled to Disability Insurance Benefits under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 416(i), 423(d) (2009). Mr. Fuchs asks the court to reverse the decision without remand for a rehearing. Alternatively, Mr. Fuchs asks the court to reverse the final decision with a remand for a new hearing. The Commissioner requests the court to affirm the administrative law judge's decision that plaintiff was not disabled and deny plaintiff's requested remedy.

## I.

### PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on December 15, 2009. (R. 152-158). Plaintiff's application was denied initially on February 6, 2009 (R.73). The application was again denied upon reconsideration on May 13, 2009. (R.74).

At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on April 13, 2010. (R.78). At the hearing, the plaintiff amended the alleged onset date of disability from March 17, 2005, to December 28, 2008. (R.194). Thomas Dunleavy, a vocational expert, and Constance Fullilove, Ph.D., a medical expert, testified. (R. 134-136).

On August 25, 2010, the ALJ issued his decision, finding that plaintiff was not disabled. (R.78-94). On September 8, 2010, plaintiff requested a review of that decision. (R.145-146). The request was denied on August 19, 2011. (R.95). Plaintiff then initiated this civil action for judicial review of the Commissioner's final decision.

## II.

### THE RECORD EVIDENCE

### A.

### The Vocational Evidence

Mr. Fuchs was born on February 14, 1958, making him fifty two years old at the time of the ALJ's decision. (R. 202). He has a high school education. (R.8, 329). He last worked as a janitor for Sam's Club from July 2007 until December 2008. (R.326). He was fired when he could not concentrate and get the job done correctly (R.9). Before that, Mr. Fuchs worked as a barber from March 1995 until June 2006. (R.326).

### B.

### The Medical Evidence

Mr. Fuchs was hospitalized at Silver Cross Hospital from March 16 to March 18, 2006, for a bipolar episode, manic, with psychosis. (R.356-360). He was noted to be paranoid and was hearing

voices as well as having grandiose ideas. *Id*. Auditory hallucinations were described as the "devil talking to him." *Id*. His GAF score was 20 at the time of admission and 40 upon discharge. *Id*.

From July 21 to July 27, 2007, Mr. Fuchs was hospitalized at Provena Saint Joseph Medical Center. (R.435-439). He was noted to be paranoid and delusional and was experiencing flight of ideas. *Id*. He was also noted to have stage 3 chronic kidney disease. (R.440).

Mr. Fuchs was again hospitalized at Provena Saint Joseph Medical Center from July 19 to July 21, 2008. (R.388-395). He was noted to have "alerted mental status changes" and was found to have increased lithium levels. *Id*. He reported hearing voices telling him to kill himself and hoping that his family dies. *Id*. His brother reported that claimant has been worsening with regards to psychosis, having persecutory and paranoid ideations. *Id*.

Dr. Boddapati has been the plaintiff's psychiatrist since 2002. (R.661). In a treatment note dated September 12, 2008, Mr. Fuchs admitted to auditory hallucinations, and is noted to have problems with social skills. (R.479). On October 27, 2008, Mr. Fuchs presented for psychiatric evaluation. He was diagnosed as having paranoid schizoaffective disorder and was assigned a GAF score of 45. (R.474-475). On June 24, 2009, plaintiff reported paranoia and difficulty sleeping. (R.650). Furthermore, on October 19, 2009, plaintiff reported auditory hallucinations and paranoia. (R.648). He is noted to be "unable to function." *Id*.

In a report dated March 15, 2010, Dr. Boddapati opines that Mr. Fuchs is unable to function in a competitive work setting on a full-time basis. Dr. Boddapati also opines that Mr. Fuchs exhibits manic syndrome, manifested by hyperactivity, flight of ideas, decreased need for sleep, easy distractibility, and hallucinations, delusions, or paranoid thinking resulting in marked restrictions

in activities of daily living, and extreme difficulties in maintaining a social functioning, maintaining concentration, persistence, and pace, as well as repeated episodes of decompensation. (R.661-663).

Mr. Fuchs began seeing Terry Nolan for regular therapy sessions in September of 2008. (R.601-614). In their initial meeting on September 12, 2008, Mr. Nolan notes Mr. Fuchs to have auditory hallucinations and to believe his downstairs neighbor is running a "secret cell." (R.614). On October 2, 2008, plaintiff reported to Mr. Nolan that he is hearing voices when he listens to music. (R.613). Plaintiff is also noted to have some paranoia. *Id.* On January 7, 2009, Mr. Nolan notes that plaintiff was fired from his maintenance job for being too slow. (R.608). On July 7, 2009, plaintiff reported auditory hallucinations. (R.601). On August 10, 2009, plaintiff is noted to be "agitated and fidgety," (R.655). On October 18, 2009, Mr. Nolan notes that "the client speaks as if his problems with his neighbors and the voices he heard were real." (R.654).

In a report dated March 3, 2010, Mr. Nolan opines that claimant's illness markedly restricts daily activities, and markedly restricts socialization. Mr. Nolan also notes that fatigue and stress usually trigger the paranoid episodes. (R.659-660).

## C.

### The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

Mr. Fuchs testified that he believes when he goes to the grocery store, "they turn up the intercom when I come in the building and warn everyone I'm there." (R.31). When asked by the ALJ why he thinks he cannot work in a full-time capacity, he replied, "a lot of it's concentration. I, I

can't remember where I'm at. I do things – over. I constantly have to drink out of the fountain. I'm using the bathroom at least six times. I'm wandering. I don't get anything done." (R.37).

## 2.

### The Medical Expert's Testimony

At the hearing, Dr. Fullilove was called upon to serve as an impartial medical expert. She testified that plaintiff has paranoid schizophrenia, bipolar disorder, and substance abuse. (R.53). She further testified that based on the record, plaintiff meets listing 12.03 for psychotic disorders. (R.54). In making this determination, she considered plaintiff's delusions and hallucinations, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. *Id*. Dr. Fullilove also found plaintiff to have moderate restrictions in activities of daily living, noting that the severe limitations of his functionality are not dependent upon his drug use. *Id.*

The ALJ questioned the medical expert about places in the record where the treating doctor's assessment does not seem as severe as Dr. Fullilove's assessment. (R.57). Dr. Fullilove replied:

> The evidence indicates that there are times when Mr. Fuchs tends to function better than at other times. And I think that's part of the pattern. He, he can look good for a while, but it appears that, in terms of being able to persist with, sometimes, his employment or competitive activity, the persistence – the ability to persist is totally not there. So, sometimes he looks fairly stable and can perform for a while, then it, it's – he kind of breaks down, and it's sometimes kind of kicked back down whether or not he's, he's using or noncompliant with medication, or whatever the case may be, just the normal course of the disease over a while. Over a period of time, it's, it's – there's an inconsistency that's not documented. That's what happened before.

(R.58).

## 3.

### The Vocational Expert's Testimony

Mr. Dunleavy testified as a vocational expert. The ALJ asked the vocational expert to assume a person of the claimant's age, education, and work experience could perform simple, routine, repetitive tasks in a work environment that would be free of fast-paced production requirements, involving only simple work-related decisions, with few workplace changes. (R.62). Mr. Dunleavy said that such a person could not perform Mr. Fuchs's past work because it is too fast-paced. (R.64). However, such a person could perform similar jobs, such as housekeeping, of which there are a significant number of positions in the Chicago Metropolitan area. *Id.* The ALJ then changed the hypothetical to additionally require that the person would only have occasional interaction with the public and only occasional contact with coworkers or supervisors. (R.65-66). Mr. Dunleavy testified that such a person would still be able to work as a housekeeper, as well as a laundry folder or hand packager. (R.65-67). There are a significant number of laundry folder and hand packager jobs in the region. *Id*.

### III.

### THE ALJ'S DECISION

The ALJ found that Mr. Fuchs has suffered from schizophrenia, bipolar disorder, and substance abuse. (R.80). After reviewing the medical record, the ALJ determined that these impairments fail to meet or medically equal a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1, giving particular consideration to Listings 12.03, 12.04, and 12.09. (R.81). She considered the longitudinal record and the opinion of the state agency psychological consultant to conclude that the claimant failed to satisfy "paragraph B" criteria, which requires that the impairments result in at least two of the following: "marked restriction of activities of daily living;

marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." *Id.* She also concluded that the claimant failed to satisfy "paragraph C" criteria, finding that the evidence fails to support a finding of "repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustments that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.*

Neither of the two state agency consultants actually examined the claimant. They merely completed assessments based on the record. (R. 496-509, 571-573). They concluded that the claimant's schizophrenia, bipolar disorder, and substance abuse resulted in only a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation for an extended duration. (R.84). The state agency consultants recognized that the plaintiff was recently discharged from his job for working too slow, but noted this could have resulted from drug abuse. *Id.* The consultants found that while the claimant's social skills were impaired, they still allowed for settings with reduced interpersonal contact. (R.85). Furthermore, the consultants found that the claimant was able to perform routine, repetitive tasks. *Id.* After reviewing the record, the ALJ found the state agency psychological consultants' assessment to be consistent with the record. (R.87). The ALJ concluded that the claimant retains the residual functional capacity to perform simple, routine, and repetitive tasks in a work environment free of fast paced production requirements and involving

only simple work-related decisions, few, if any, work place changes, no public interaction, and only occasional interaction with co-workers and supervisors. *Id.*

In evaluating the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his functioning, the ALJ found Mr. Fuchs's statements not to be credible because he had reported "he was feeling fine" in July 2008, September 2008, October 2008, and January 2009. (R.83). Also, in September 2008, Mr. Nolan noted that Mr. Fuchs was able to handle stress and conflict resolution, care for his own possessions, and owned his own condo. *Id.* Mr. Nolan also found that Mr. Fuchs's concentration, focus, and insight were good, and that his memory was normal. *Id.* Mr. Nolan found the claimant's sole problem area was auditory hallucinations, and that he has paranoid schizophrenia. *Id.* Mr. Nolan noted plaintiff's GAF score to be 65, which had been as low as 20. Mr. Nolan also noted that plaintiff had used marijuana.

The ALJ noted, but gave little weight to the opinions of Mr. Fuchs's psychiatrist, his therapist, and the impartial medical expert, who testified at the hearing. Dr. Boddapati, the treating psychiatrist, reported that the claimant was very paranoid and thought people were talking about him, particularly his neighbor. (R. 85). Also, the claimant's symptoms were "exacerbated" by his daughter's behavioral problems. *Id.* She indicated that the claimant's mental condition met the criteria for affective disorder under Listing 12.04 as he had manic syndrome with hyperactivity, flights of ideas, decreased need for sleep, easy distractibility, and hallucinations, delusions, or paranoid thinking. *Id.* She concluded that the claimant's affective disorder resulted in a marked restriction of activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties maintaining concentration, persistence, or pace; and four or more episodes of decompensation, each of extended duration. *Id.*

The ALJ rejected this testimony, stating "[i]nterestingly, this medical source statement followed two months of visits in which [Mr. Fuchs] had no complaints and was feeling well." (R. 85). This statement was purportedly supported by Exhibits 14F, 17F, and 10F. None of these exhibits were notes of Mr. Fuchs's psychiatrist. Two of the exhibits, 10F and17F, were the notes of Mr. Fuchs's nephrologist, Dr. Alausa. Exhibit 14F is a group exhibit containing a page in which Mr. Nolan recorded his observation that in his judgment, Mr. Fuchs seemed happy and encouraged on the date of that particular visit, which was December 18, 2009. (R. 652).[1] *See infra* at 15-17.

Mr. Fuchs's therapist, Mr. Nolan, noted that the claimant believed his downstairs neighbor was very confrontational, and that his daughter's presence was stress inducing. (R. 85). Mr. Nolan noted that fatigue and stress usually triggered the claimant's paranoid episodes, and the claimant's stress from his daughter and paranoid beliefs about his neighbor led to hospitalizations. *Id.* The ALJ found Mr. Nolan's opinion that claimant is disabled to be inconsistent with his progress notes, his advice to the claimant to get a job, and his evaluations of the claimant's functioning at a GAF score of 65. (R.87).

Dr. Fullilove, the medical expert present at the hearing, testified that based upon her review of the record, she believed Mr. Fuchs had paranoid schizophrenia, bipolar disorder, and substance abuse issues. (R.85). She concluded that the claimant's schizophrenia resulted in a moderate restriction of activities of daily living; marked difficulties maintaining social functioning; marked difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. (R.86). She testified that the claimant sometimes had symptoms that really interfered with his ability

---

[1] The index to the Record reflects that Dr. Boddapati's notes are Exhibit 8F and span the period 9/16/08 to 5/6/09 and appear at pages 546-570 in the Record. The ALJ did not contend that there was anything in those notes that reflected statements by Mr. Fuchs that he was feeling good. The index reflects that Dr. Alausa's notes are 10F and 17F and span the period 6/29/07 to 6/29/09 and a visit on 1/6/10. *See* R. 574-600, 664.

to take care of himself; she noted that the claimant's symptoms more than mildly impacted his ability to function adequately, and that when his symptoms were acute, he had difficulties going out. *Id*. She found the claimant's symptoms markedly impacted his social functioning because he tended to position himself away from people and had difficulty with others. *Id.*

She found that the claimant was confused and could not follow instructions based upon his testimony, such that he could not persist. *Id.* She testified that the claimant's hospitalizations were not for extended periods of duration. *Id.* She explained that the evidence indicated there are times when the claimant tended to function better than at other times. She noted that the claimant does not have the ability to persist with competitive employment and competitive activities. *Id.* Furthermore, she testified that she did not believe the claimant's substance abuse was material because it appeared the claimant's level of functioning did not significantly change whether he was using or not using, and that his functioning was severely limited whether or not he was sober or using drugs. *Id*. However, the ALJ notes that the record shows that the use of drugs was most likely the cause of the claimant's being fired from his last job. *Id.*

Based on the evidence, Dr. Fullilove concluded that while the claimant looked fairly stable sometimes and would perform for a little while, there was a pattern of breakdowns and symptom flare-ups, whether or not he was using substances or was noncompliant with medications, which was part of the normal course of the disease. *Id.* The ALJ gave little weight to the opinion of Dr. Fullilove, finding that it was inconsistent with the medical record. The ALJ noted, "the claimant's periods of doing well as noted by the medical expert are neither infrequent nor fleeting." *Id.* The claimant worked through September 1, 2011. *Id.* Furthermore, the ALJ pointed out that the

claimant's episodes are triggered by his daughter, and therefore, there is a known method to substantially reduce the claimant's episodes. (R. 87).

Finding that the opinions of the psychiatrist, therapist, and medical expert were not supported by the record, the ALJ held that Mr. Fuchs's mental impairments limit him to simple, routine, repetitive tasks in a work environment free of fast paced production requirements and involving only simple work-related decisions, few, if any, work place changes, no public interaction, and only occasional interaction with co-workers and supervisors. *Id.*

Based on the testimony of the vocational expert, the ALJ concluded that Mr. Fuchs is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R.89). Therefore, the ALJ found Mr. Fuchs to be not disabled.

## IV.

## DISCUSSION

### A.

### The Standards of Review

We review the ALJ's decision directly, but we do so deferentially, *Weatherbee v. Astrue,* 649 F.3d 565, 568–69 (7th Cir. 2011), and we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 513–514 (7th Cir. 2009); *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan,* 988 F.2d 789, 792 (7th Cir. 1993). *See also Weatherbee,* 649 F.3d at 568–69.[2] If it is, the court must affirm the decision. 42 U.S.C. §

---

[2] To be "disabled" as defined by the Act, 42 U.S.C. § 423(a)(1)(E), a claimant must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant's physical or mental impairment

(continued...)

405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Schaaf v. Astrue,* 602 F.3d 869, 874 (7th Cir. 2010).

The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Weatherbee,* 649 F.3d at 568–69; *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila,* 573 F.3d at 513–514; *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997). Since conclusions of law are not entitled to such deference, where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). It is a "lax" standard. *Berger,* 516 F.3d at 545. It is enough if the ALJ " 'minimally articulate[s] his or her justification for rejecting or accepting

---

(...continued)

or impairments must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A). *Weatherbee,* 649 F.3d at 568–69.

specific evidence of a disability.' " *Id.*; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001);

*Mueller v. Astrue,* 2012 WL 1802075, 1 -2 (N.D.Ill.2012)( *Sarchet* relied on *Herron v. Shalala,* 19

F.3d 329 (7th Cir.1994), which held: "We have repeatedly stated that the ALJ's decision must be

based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some

minimal level his analysis of the evidence. ").

## B.

### The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine

whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila,* 573 F.3d at 512–13; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d

345, 351–52 (7th Cir. 2005).

An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the

claimant is disabled. 20 C.F.R. § 416.920; *Briscoe,* 425 F.3d at 352. A negative answer at any point,

other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20

C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden

of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must

present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee,* 649 F.3d at 569–70; *Briscoe,* 425 F.3d at 352.[3]

## C.
## Analysis

### 1.

Mr. Fuchs first contends that the ALJ improperly dismissed the opinion of the medical expert, who opined that claimant's disabilities warrant a finding of meeting listing 12.03. The ALJ must "minimally articulate [her] reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000); *Briscoe,* 425 F.3d at 354. She must build a logical bridge from the evidence to her conclusion. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000).

The ALJ found that Dr. Fullilove's opinion does not comport with the medical record. As she explained it, the claimant's periods of doing well are neither infrequent nor fleeting. (R. 87). Mr. Fuchs has worked, and is insured through September 1, 2011. Furthermore, Dr. Fullilove opined that the claimant has not suffered from any episodes of decompensation as defined by the Social Security regulations. The ALJ noted that perhaps most significantly, there is a well known and concrete trigger to the claimant's episodes – interaction with the claimant's adult daughter. Therefore, the ALJ concluded that there is a known method to substantially reduce the claimant's episodes. Presumably, she refers to isolating the claimant from his daughter. How that could occur, she does not say, nor does she acknowledge that the daughter is not the only exacerbating factor for plaintiff's problems. *See supra* at 8.

---

[3] Residual functional capacity is defined as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).

Plaintiff contests the ALJ's decision to dismiss Dr. Fullilove's opinion on multiple grounds. First, he contends that the ALJ erred in considering claimant's periods of doing well. (*Plaintiff's Brief*, at 9). The ALJ's narrow focus on isolated statements by the plaintiff that he was feeling well ignores the established principle that:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.

*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). Like the plaintiff in *Bauer*, Mr. Fuchs is on several medications for mental illness, and Dr. Fullilove testified that she believes the claimant does not have to ability to persist in employment or competitive activity despite isolated periods or moments of feeling good. (R.58).

In rejecting the medical expert's conclusions, the ALJ pointed to four occasions during which Mr. Fuchs reported that he was feeling fine. (R. 87). *See supra* at 8. The ALJ did not explain on page 87 to whom these statements had been made. Nor did she explicitly do so on page 83 when she initially rejected the psychologist's testimony because "interestingly," Mr. Fuchs had reported he was feeling well on less than a handful of occasions. However, her reference to Exhibit 10F on page 83 of the Record reveals that Mr. Fuchs's statements were made to his nephrologist, Dr. Alausa. Exhibit 10F is a large group exhibit comprised of his treatment notes and kidney- related materials.

Like the ALJ's opinion, the government's brief ignores the fact that the statements were made to Mr. Fuchs's nephrologist. (Government's Brief at 8). Yet, without an analysis of the context in which Mr. Fuchs made his statements – the identity of the person to whom the statements were

made is obviously a critical component of that analysis – they can have no relevance. Or at least not the relevance the ALJ and the government seek to ascribe to them.

An answer to a question has no meaning unless one knows the question that was asked. *Cf. In Re Sawyer*, 360 U.S. 622, 649 (1958)(Frankfurter, J., dissenting). Context is everything, and the meaning of any word or act is dependent on that context. *Cf., Schenck v. United States*, 249 U.S. 47 (1919)(Holmes, J.)("[T]he character of every act depends on the circumstances in which it is done."). The isolated statements on which the ALJ erroneously placed so much reliance were made in the context of a visit between Mr. Fuchs and his nephrologist, who was treating him for stage 3 kidney disease. It is reasonable to assume that Mr. Fuchs's statements that he was feeling well were in response to a question by Dr. Alausa about Mr. Fuchs's physical condition related to his kidney disease, or his overall physical state.

It is one thing to tell a mental health professional that you're feeling well. It is a vastly different thing to make the statement to one's nephrologist. In the latter context, the statement is quite irrelevant to assessing the patient's mental state. "There is no reason to expect a doctor, asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it." *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995). Nor is there any reason to expect a patient seeing a medical specialist for kidney disease to comment on his psychological condition or to assume that when he is asked how he is feeling, the question goes farther than to focus on his physical well being. Perhaps Mr. Fuchs did have something more in mind. But the ALJ made no attempt to ask him during his testimony and to conclude that the statements related to his mental state was impermissibly speculative.[4]

---

[4] There is nothing in the ALJ's opinion or in Dr. Alausa's treatment notes dealing at all with Mr. Fuchs's mental condition.

Two pages after the ALJ's terse reference to the statements by Mr. Fuchs in July, September and October 2008 and January 2009 – to his nephrologist – the ALJ also notes: "[i]nterestingly, this medical source statement followed two months of visits in which the claimant had no complaints and was feeling well." (R. 85). One of the two references is to Exhibit 17F, which is another treatment note by Dr. Alausa dated January 6, 2010. (R. 664). It thus has no more significance than his other notes. The other supposedly supporting reference is to Exhibit 14F, which spans 13 pages in the record. (R. 646 - 658). These are progress notes by Mr. Nolan.

The ALJ's decision does not point to any specific entry or even to any specific page of the Exhibit, thereby making judicial review more difficult. *Compare United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991)("Judges are not like pigs, hunting for truffles buried in [the record]."); *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.1999)(Judges are not required to play "archaeologist with the record."). The only thing in Mr. Nolan's notes that is remotely supportive of the ALJ's assessment is the entry on page 652 of the Record. It is dated December 18, 2009, and states that Mr. Fuchs was dressed for a job interview and that Mr. Nolan observed that Mr. Fuchs seemed "happy and encouraged." But that is Mr. Nolan's observation, not a statement by Mr. Fuchs as the ALJ erroneously thought.

Ignored was Mr. Nolan's note of October 6, 2009, which states that Mr. Fuchs arrived for his appointment "still delusional and hallucinating." Mr. Fuchs's medication was increased at this appointment to enable him to cope with the voices he was hearing. (R. 656). This apparently was not deemed important by the ALJ and does not find its way into the government's brief, which instead focuses on the statement in this note that Mr. Fuchs's appears to be following an annual pattern of instability which should be followed by a long period of stability. (*Government's Brief*

at 10; R. 656). The next note of significance in the exhibit, however, warns of the high potential for future "psychiatric incidents" because of various stressors of long and continuing duration in Mr. Fuchs's life. (R. 658).

The ALJ's concentration on a handful of terse statements by Mr. Fuchs that he was feeling good – and there are none when the statements to Dr. Alausa are eliminated – ignores consistent Seventh Circuit precedent condemning the kind of analysis engaged in by the ALJ in this case. Mental illnesses are episodic by nature. *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). They "are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms." *Phillips v. Astrue*, 413 Fed.Appx. 878, 886 (7th Cir. 2010). As the Seventh Circuit has repeatedly explained, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *see also, e.g., Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010); *Wilson v. Astrue,* 493 F.3d 965, 967–68 (8th Cir. 2007).

Mr. Fuchs began seeing Terry Nolan for regular therapy sessions in September of 2008. (R.601-614). In their initial meeting on September 12, 2008, Mr. Nolan notes Mr. Fuchs to have auditory hallucinations and to believe his downstairs neighbor is running a "secret cell." (R.614). On October 2, 2008, plaintiff reported to Mr. Nolan that he is hearing voices when he listens to music. (R.613). Plaintiff is also noted to have some paranoia. *Id.* On July 7, 2009, plaintiff reported auditory hallucinations. (R.601). On August 10, 2009, plaintiff is noted to be "agitated and fidgety," (R.655). On October 18, 2009, Mr. Nolan notes that "the client speaks as if his problems with his neighbors and the voices he heard were real." (R.654). And, in the note of October 6, 2009, Mr. Fuchs arrived "still delusional and hallucinating...." (R. 656). In a report dated March 3, 2010, Mr.

Nolan opines that claimant's illness markedly restricts daily activities, and markedly restricts socialization. Mr. Nolan also notes that fatigue and stress usually trigger the paranoid episodes. (R.659-660). The ALJ apparently did not find any of this significant, preferring instead to focus on isolated, irrelevant comments to a nephrologist.

Plaintiff further argues that the ALJ was wrong in giving weight to the finding that Mr. Fuchs's daughter triggers his symptoms. Plaintiff makes this argument in three parts. First, he contends that the laws and regulations governing Social Security Disability allow for no consideration of causation. Second, plaintiff highlights that Dr. Fullilove was aware of claimant's problems with his daughter when she provided her opinion. Third, plaintiff complains that the ALJ failed to show how conflict with one child can cause psychosis.

It is unnecessary to discuss whether or not social security law allows for consideration of causation. In order for the ALJ to use the finding that the daughter triggers claimant's symptoms to disregard Dr. Fullilove's opinion, the ALJ must articulate her reasoning in doing so. In this case, the ALJ failed to build a logical bridge between her finding that the daughter triggers the claimant's episodes and her decision to reject the medical expert's testimony. It is not enough to simply state that there is a known method to substantially reduce the claimant's episodes. This fails to even minimally explain why the expert's opinion is not credible.

The daughter is one of many potential triggers. Mr. Nolan noted in his treatment notes that fatigue and stress usually trigger the paranoid episodes. (R.659-660). On January 7, 2009, Mr. Nolan notes that plaintiff was fired from his maintenance job for being too slow (R.608) – a situation having nothing to do with his daughter. Finally, despite some speculative intimations by the ALJ, drugs are irrelevant here. *See supra* at 10.

Further, plaintiff argues that Dr. Fullilove's testimony should carry more weight than the ALJ gave to it because it is supported by the treatment notes and opinions of plaintiff's treating sources. This point may be merged with plaintiff's second complaint, which is discussed next.

**2.**

Mr. Fuchs contends that the ALJ erred in dismissing the opinions of the treating sources. A treating source's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt,* 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005). This rule takes into account the treating source's advantage in having personally examined the claimant and having developed a rapport, while controlling for the biases that a treating source may develop, such as friendship with the patient. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Dixon,* 270 F.3d at 1177.

The Seventh Circuit has offered some elaboration on the rule:

> Obviously if [the treating source's opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating [source's] evidence is no longer entitled to controlling weight.

*Hofslien,* 439 F.3d at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. In deciding how much weight to accord a treating source's opinion, the ALJ should consider various factors, like how often the treating source has examined the claimant, whether the source is a specialist in the condition claimed to be disabling, and so forth. 20 C.F.R. § 404.1527(d); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); *Hofslien*, 439 F.3d at 377. These factors support plaintiff's treating sources. Mr. Nolan,

the treating therapist, saw claimant fourteen times. (R. 601-614). Dr. Boddapati, the treating psychiatrist, had been seeing plaintiff since 2002 – several years before the plaintiff ever filed for disability benefits.

If an ALJ does not give the treating source's opinion controlling weight, she must provide "good reasons" for how much weight she accords it. *Scahaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010); *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008); *Schmidt*, 496 F.3d at 842. The ALJ concluded that the opinion of Mr. Nolan is "inconsistent with both his progress notes, his advice to the claimant to get a job, and his evaluations of the claimant's functioning at a GAF score of 65." (R.87). That conclusion is simply unsustainable.

Then the ALJ disregarded the opinion of Dr. Boddapati because it "was not consistent with the previous two monthly visits of the claimant in which reported the claimant was feeling good." *Id.* This conclusion is patently wrong for the reasons and cases discussed above. *See supra at* 15 *et. seq.* Two consecutive monthly visits in which Mr. Fuchs reported feeling fine to his nephrologist – or anybody else – is not inconsistent with the nature of mental illness. The GAF score of 65 does not change the result. At best, it is merely some evidence that the claimant's mental illness was episodic. The record shows that at another time, claimant's GAF score was as low as 20. (R. 358).

A score of 65 denotes mild symptoms; a 20 suggests very significant problems that may even mean the person is a danger to themselves or others. www.gafscore.com. Due to the sporadic nature of mental illness, periods of wellness are not inherently adverse to a finding of disability. *Phillips*, 413 Fed.Appx. at 886; *Bauer*, 532 F.3d at 609; *Kangail*, 454 F.3d at 629. Furthermore, if the ALJ is referring to the notes of the nephrologist (as the government did in its brief), then the periods of doing well are fewer and even more irrelevant to the analysis.

**3.**

Finally, Mr. Fuchs correctly contends that the ALJ's adverse credibility finding was flawed. The ALJ's credibility determination is reviewed with "special deference," *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010); *Briscoe,* 425 F.3d at 354, because the ALJ, not a reviewing court, is in the best position to evaluate credibility, having had the opportunity to observe the claimant testifying. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171, (1944) (Jackson, J., dissenting) ("A few minutes observation of the parties in the courtroom is more informing than reams of cold record."). The credibility determination need not be flawless, *Simila,* 573 F.3d at 517, and will be reversed only if is "patently wrong." *Jones,* 623 F.3d at 1162. That occurs only when the determination is "lack[ing] any explanation or support." *Id.* at 1160; *Simila,* 573 F.3d at 517. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue,* 390 F. App'x 581, 587 (7th Cir. 2010).

"Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry*, 580 F.3d at 477. Despite the high level of deference given to the ALJ, in this case, her evaluation of the claimant's credibility is insufficient because she failed to address points in the claimant's testimony that are crucial to his claim. For instance, the plaintiff testified that it's difficult for him to shop for groceries as he believes people think he is Satan. (R.30). That sort of testimony is perfectly consistent with the medical evidence as is his testimony that he does not listen to the radio because he thinks he's being talked about. (R.33). He prepares himself frozen dinners on a daily basis (R.252), but his eighty four year old father pays the bills for him. (R.35).

Such evidence, if taken to be credible, suggests greater than "mild" limitations in plaintiff's activities of daily living, which are seldom in  themselves outcome-determinative. The ability to minimally care for oneself does not mean that one can work. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons ...and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir.2012).

Of course, an ALJ is never required to accept a claimant's testimony as true. *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006). But, "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7P, 1996 WL 374186, at *4 (S.S.A. July 2, 1996). In this case, the ALJ concluded that Mr. Fuchs was not credible because of four statements made to his nephrologist that he was feeling well at the time of his visit for treatment for stage 3 kidney disease.  That conclusion was patently wrong and Mr. Nolan's single observation that, in his view, at one of Mr. Fuchs's appointments he seemed happy and encouraged, does nothing to sustain the ALJ's rather flawed credibility determination.

**CONCLUSION**

Plaintiff's motion for reversal and remand is GRANTED, and the case is remanded to the Commissioner for further proceedings consistent with this opinion. The Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: July 6, 2012